**CITY OF EAST BETHEL,
et al., Respondents,**

v.

**ANOKA COUNTY HOUSING AND RE-
DEVELOPMENT AUTHORITY,
Appellant,**

**Larry Dalien, Division Manager, Anoka
County Property Records and
Taxation, Respondent.**

**No. A10–1628.**

Court of Appeals of Minnesota.

May 3, 2011.

George C. Hoff, Justin L. Templin, Hoff, Barry & Kozar, P.A., Eden Prairie, MN, for respondents City of East Bethel, et al.

Aaron D. Van Oort, Jennifer Y. Dukart, Faegre & Benson LLP, Minneapolis, MN, for appellant.

Anthony C. Palumbo, Anoka County Attorney, Bryan Frantz, Daniel A. Klint, Assistant County Attorneys, Anoka, MN, for respondent Larry Dalien.

Considered and decided by WORKE, Presiding Judge; KALITOWSKI, Judge; and STAUBER, Judge.

## OPINION

KALITOWSKI, Judge.

In this taxation dispute, appellant ACHRA challenges the district court's declaratory judgment, which prevents ACHRA from imposing a special levy on real property within the boundaries of respondent City of East Bethel. ACHRA contends that neither Minn.Stat. §§ 469.001–.047 (2010) (the housing and redevelopment act) nor the special law au-

thorizing ACHRA's creation limits ACHRA's ability to assess special-benefit taxes in cities that have their own HRAs. In the alternative, ACHRA argues that if its ability to assess special taxes is limited by statute, ACHRA is only prohibited from assessing special taxes in those cities that established an HRA before ACHRA was created. East Bethel challenges the timeliness and scope of the appeal.

## FACTS

ACHRA was established in 1994 based on the authority provided in a 1978 special law. Since 1994, ACHRA has imposed special levies on real estate throughout Anoka County to support its operations and projects. In 2009, East Bethel created its own HRA under the housing and redevelopment act. *See* Minn.Stat. § 469.003 (authorizing cities to create HRAs). In September 2009, East Bethel commenced an action against ACHRA, seeking injunctive and declaratory relief to prevent ACHRA from assessing special taxes on real estate within East Bethel. ACHRA argued that the special law only limited its taxing authority in cities with HRAs that preexisted ACHRA and that allowing cities to withdraw from ACHRA's taxing district would threaten ACHRA's future viability. Interpreting the special law within the context of the housing and redevelopment act, the district court granted a temporary injunction and, after a bench trial, entered declaratory judgment against ACHRA.

ACHRA moved for a new trial under Minn. R. Civ. P. 59.03 and for amended findings under Minn. R. Civ. P. 52.02. ACHRA argued that the district court should amend its findings to include discussion of ACHRA's county-wide programs and change its conclusions of law to state that ACHRA's taxing district is limited only by preexisting city HRAs.

ACHRA requested a new trial on the issue of whether it could assess special-benefit taxes on property within East Bethel. In its supporting memorandum, ACHRA raised new statutory-interpretation arguments. After a hearing, in which the additional statutory-interpretation arguments were discussed, the district court denied both motions.

## ISSUES

1. Did ACHRA file a timely notice of appeal and preserve all of its arguments for appeal?

2. Does ACHRA have authority to impose special levies on real property in East Bethel after the creation of East Bethel's HRA?

## ANALYSIS

### I.

When a "proper and timely" motion for amended findings of fact or for a new trial is filed, the 60–day period for filing an appeal does not begin to run until "the service by any party of notice of filing of the order disposing of the last such motion outstanding." Minn. R. Civ.App. P. 104.01, subds. 1, 2(c)–(d). In the absence of a proper and timely posttrial motion authorized by rule 104.01, the period for filing an appeal expires 60 days after judgment is entered. *Id.,* subd. 1.

ACHRA filed its notice of appeal on September 16, 2010. East Bethel argues that because ACHRA's posttrial motions were improper motions for reconsideration, ACHRA was required to file its notice of appeal by September 13, 2010—60 days after the declaratory judgment was entered. We disagree.

■ To be proper, a posttrial motion must be authorized. *Madson v. Minn. Mining & Mfg. Co.,* 612 N.W.2d 168, 172 (Minn.2000). A motion is authorized, and

therefore proper, if "on the face of the document the party has filed a motion that is expressly allowed under [rule 104.01,] subdivision 2." *Id.* Rule 104.01, subdivision 2, allows motions for amended findings and a new trial.

### Motion for New Trial

■ A motion for a new trial must make that request expressly and state the basis for the request "explicitly and with specificity." *Swartwoudt v. Swartwoudt,* 349 N.W.2d 600, 602 (Minn.App.1984), *review denied* (Minn. Sept. 12, 1984); *see also* Minn. R. Civ. P. 7.02(a) (requiring motions to "state with particularity the grounds therefor"). Rule 59 permits a motion for a new trial on the ground that "[t]he verdict, decision, or report is ... contrary to law." Minn. R. Civ. P. 59.01(g). If ACHRA did not file a motion for a new trial, the scope of review on appeal would be limited. *See Gruenhagen v. Larson,* 310 Minn. 454, 458, 246 N.W.2d 565, 569 (1976) (stating that "where there has been no motion for a new trial the only questions for review are whether the evidence sustains the findings of fact and whether such findings sustain the conclusions of law and the judgment").

We reject East Bethel's argument that because ACHRA's motion for a new trial challenged the district court's statutory interpretation on undisputed facts after a bench trial, it was an improper motion for reconsideration. And we conclude that ACHRA's request for a new trial and the basis for the request were sufficiently specific and explicit in its motion and memorandum to toll the time for filing a notice of appeal. *See GN Danavox, Inc. v. Starkey Labs., Inc.,* 476 N.W.2d 172, 176 (Minn.App.1991) (holding that inclusion of issue in memorandum gave defendant the opportunity to respond and allowed district

court to address the issue), *review denied* (Minn. Dec. 13, 1991).

## Motion for Amended Findings

■■■ A motion for amended findings "must both identify the alleged defect in the challenged findings and explain why the challenged findings are defective." *State by Fort Snelling State Park Ass'n v. Minneapolis Park & Recreation Bd.*, 673 N.W.2d 169, 178 & n. 1 (Minn.App.2003) (citing *Lewis v. Lewis*, 572 N.W.2d 313, 315 (Minn.App.1997), *review denied* (Minn. Feb. 19, 1998), and discussing its continued viability in determining whether a motion for amended findings has the necessary components), *review denied* (Minn. Mar. 16, 2004). ACHRA submitted proposed amended findings with its memorandum and discussed these at oral argument on the motions. Thus, this motion was also proper.

■ Finally, the district court did not state that ACHRA's motions were improper at the hearing on the motions or in its order denying the motions. In concluding that a motion is proper if on its face it is a motion expressly authorized by rule 104.01, subdivision 2, the supreme court was concerned about eliminating uncertainty and stated that this test "provides the court and all of the parties to the litigation with the clarity that the 1998 amendments were trying to achieve. A party will not have to await the resolution of its motion to determine whether the motion has tolled the time for appeal." *Madson*, 612 N.W.2d at 172. On this record, to conclude that the motions were improper and did not toll the period for appeal would inject the uncertainty and confusion that *Madson* and the amendments to rule 104.01 were intended to address.

## Scope of Arguments on Appeal

■ East Bethel argues that on appeal ACHRA is limited to the specific statuto-

ry-interpretation arguments it raised at trial. We disagree. Although ACHRA did not present all of its arguments before the district court took the case under advisement, all of the relevant statutes were identified. Moreover, all of the arguments presented on appeal were submitted to the district court through posttrial motions. We agree that parties should present their arguments to the district court for consideration at the outset and that failure to do so may waive consideration of these arguments. *See Antonson v. Ekvall*, 289 Minn. 536, 539, 186 N.W.2d 187, 189 (1971) (concluding that tort claim not specifically pleaded or presented at trial was waived when it was raised for first time in a motion for new trial); *Minn. Mut. Fire & Cas. Co. v. Retrum*, 456 N.W.2d 719, 723 (Minn.App.1990) (concluding that the district court did not abuse its discretion in denying a motion for new trial that raised a new theory and new factual argument for the first time). But on this record we conclude that the interests of justice would not be served by limiting ACHRA to the arguments it raised at trial. *See* Minn. R. Civ.App. P. 103.04 (providing for review in the interest of justice).

Here, the record indicates that the district court interpreted the statutes at issue, applied them to undisputed facts, and had an opportunity to and did consider the additional arguments. Moreover, on issues of statutory interpretation, our review is de novo and we do not defer to the district court's interpretation. Nor are we required to confine our statutory interpretation to the theories advanced by the parties. Rather, we conduct an independent review. Therefore, we will consider the additional statutory-interpretation arguments advanced by ACHRA in its posttrial motions and in its appeal.

## II.

We review issues of statutory construction de novo. *Am. Family Ins. Group v.*

*Schroedl,* 616 N.W.2d 273, 277 (Minn.2000). Our object when interpreting statutory provisions is to "ascertain and effectuate the intention of the legislature." Minn. Stat. § 645.16 (2010).

When interpreting a statute, we first determine whether the statute's language, on its face, is clear or ambiguous. *Schroedl,* 616 N.W.2d at 277. An ambiguity exists only when a statute's language is subject to more than one reasonable interpretation. *Hans Hagen Homes, Inc. v. City of Minnetrista,* 728 N.W.2d 536, 539 (Minn.2007). If the language of the statute is clear and free from ambiguity, courts apply its plain meaning. *Id.; see also* Minn.Stat. § 645.16 (stating that when the words of a statute are clear, "the letter of the law shall not be disregarded under the pretext of pursuing the spirit").

In determining whether a statute's meaning is unambiguous, courts are to construe words and phrases according to their plain and ordinary meaning. Minn. Stat. § 645.08(1) (2010); *Schroedl,* 616 N.W.2d at 277. Whenever possible, a statute should be interpreted to give effect to all of its provisions; "no word, phrase, or sentence should be deemed superfluous, void, or insignificant." *Amaral v. Saint Cloud Hosp.,* 598 N.W.2d 379, 384 (Minn. 1999). We review a statute's content to discern meaning in the full context of the act or provision and consider sections of a statute that relate to the same subject matter. *See Chanhassen Estates Residents Ass'n v. City of Chanhassen,* 342 N.W.2d 335, 339 (Minn.1984) (*Chanhassen*); *Christensen v. State, Dep't of Conservation, Game & Fish,* 285 Minn. 493, 499–500, 175 N.W.2d 433, 437 (1970).

**Enabling Legislation for ACHRA**

In 1978, the Minnesota Legislature enacted a special law that allowed the Anoka County Board of Commissioners to create ACHRA. The special law gave ACHRA all of the powers and duties of a city HRA[1] under the housing and redevelopment act:

> There is created in the county of Anoka a public body corporate and politic, to be known as the Anoka county housing and redevelopment authority, having all of the powers and duties of a housing and redevelopment authority under the provisions of the . . . housing and redevelopment act. . . . For the purposes of applying the provisions of the municipal housing and redevelopment act to Anoka county, the county has all the powers and duties of a municipality, the county board has all the powers and duties of a governing body, the chairman of the county board has all the powers and duties of a mayor, and the area of operation includes the area within the territorial boundaries of the county.

1978 Minn. Laws ch. 464, § 1, at 47 (codified at Minn.Stat. § 383E.17, subd. 1 (2010)).

Because the special law defines ACHRA's powers and duties in terms of the housing and redevelopment act, we must review ACHRA's taxing authority in the context of the act's general provisions. The housing and redevelopment act states that "[a]ll of the territory included within the area of operation of any authority shall constitute a taxing district. . . ." Minn. Stat. § 469.033, subd. 6. And the act references HRAs created by special law and provides that "[e]xcept as expressly limited by the special law establishing the [HRA], an [HRA] created pursuant to spe-

---

1. City HRAs were formerly known as municipal HRAs. *Compare* Minn.Stat. § 462.425 (1986), *with* Minn.Stat. § 469.003 (Supp. 1987). For simplicity, we refer to these entities using the current statutory terminology.

cial law shall have the powers granted by any statute to any [HRA] created pursuant to this chapter." Minn.Stat. § 469.012, subd. 11. The combination of these statutes and the definition of ACHRA's area of operation in the special law means that ACHRA can assess special levies throughout Anoka County to the extent its taxing authority is not expressly limited in the special law.

There are two additional relevant sections of the special law enabling ACHRA's creation. Subdivision 2 states:

This section shall not limit or restrict any existing housing and redevelopment authority or prevent a municipality from creating an authority. The county shall not exercise jurisdiction in any municipality where a municipal housing and redevelopment authority is established. If a municipal housing and redevelopment authority requests the Anoka County Housing and Redevelopment Authority to handle the housing duties of the municipal [authority], the Anoka County Housing and Redevelopment Authority shall act and have exclusive jurisdiction for housing in the municipality. A transfer of duties relating to housing shall not transfer any duties relating to redevelopment.

1978 Minn. Laws ch. 464, § 2, at 47 (codified at Minn.Stat. § 383E.17, subd. 2 (2010)). And the next section of the special law provides:

Before a housing or redevelopment project of the Anoka county housing and redevelopment authority is undertaken, the project shall be approved by the local governing body with jurisdiction over all or any part of the area in which the proposed project is located.

*Id.,* § 3, at 47 (codified at Minn.Stat. § 383E.18 (2010)).

East Bethel argues that the second sentence of subdivision 2 of the special law, which states that "[t]he county shall not exercise jurisdiction in any municipality where a municipal housing and redevelopment authority is established," should be understood to encompass taxing authority and is precisely the type of express limitation to which Minn.Stat. § 469.012, subd. 11, refers. East Bethel contends that ACHRA, therefore, has not been authorized to tax real property in East Bethel after East Bethel created its own HRA.

ACHRA counters that its area of operation encompasses all real property in Anoka County because an HRA's taxing authority is based on its "area of operation"—independent of any limitation on its "jurisdiction"—and that nothing in the special law or the housing and redevelopment act restricts ACHRA's area of operation. In the alternative, ACHRA argues that if subdivision 2 does restrict ACHRA's taxing authority, ACHRA is only prohibited from imposing special levies in those cities that had already established HRAs at the time ACHRA was created because "is established" refers to the present tense and should not be understood to refer to cities that may establish HRAs in the future.

**Does Jurisdiction Encompass Taxing Authority?**

We first address whether the restriction on ACHRA's "jurisdiction" in subdivision 2 limits ACHRA's authority to tax. The word "jurisdiction" means "authority or control." *The American Heritage Dictionary of the English Language* 950 (4th ed.2006). It is also defined as "[a] government's general power to exercise authority over all persons and things within its territory ... [or a] geographic area within which political or judicial authority may be exercised." *Black's Law Dictionary* 927–28 (9th ed.2009); *see* Minn.Stat. § 645.08(1) (requiring words to be con-

strued according to their common and approved usage); *State v. Hartmann*, 700 N.W.2d 449, 453–54 (Minn.2005) (applying dictionary definitions). Thus, "jurisdiction" has both a substantive aspect—the type of activities over which an entity has authority—and a geographic aspect—where the entity has authority.

ACHRA argues that the legislature's use of "jurisdiction" refers only to the substantive scope of ACHRA's authority, citing the language providing that if a city requests ACHRA to assume the city HRA's housing duties then ACHRA "shall act and have exclusive jurisdiction for housing in the municipality." But if we apply this interpretation of "jurisdiction" to the language in subdivision 2, ACHRA would have no authority to provide any housing and redevelopment services in a city with its own HRA, yet would have the authority to tax real estate within the city. Further undermining ACHRA's interpretation, Minn.Stat. § 383E.18 uses "jurisdiction" geographically, requiring ACHRA to get approval for any project from the "local governing body with jurisdiction over all or any part of the area in which the proposed project is located."

In the sentence at issue, the legislature referred to ACHRA's ability to "exercise jurisdiction" generally. Because it used the verb "exercise" and omitted any reference to a substantive area, we conclude that the word "jurisdiction" in the second sentence of subdivision 2 is best understood to refer broadly to ACHRA's "general power to exercise authority." And the ability to tax is a subset of this general authority. As such, the limitation in subdivision 2 that restricts ACHRA from exercising jurisdiction in any city where a city HRA is established limits ACHRA's ability to levy taxes in those cities.

Moreover, the provisions and structure of the housing and redevelopment act in effect when the special law was adopted support this broader interpretation of the meaning of "jurisdiction" in subdivision 2. *See Chanhassen*, 342 N.W.2d at 339 (construing laws related to the same subject and to each other together); *Christensen*, 285 Minn. at 499–500, 175 N.W.2d at 437 (construing act containing statute at issue "as a whole" (quotation omitted)). The special law states that ACHRA is the equivalent of a city HRA, not a county HRA, equating the county with a city and the chairman of the county board with a mayor. Minn.Stat. § 383E.17, subd. 1. At the time the special law was created, the housing and redevelopment act enabled both cities and counties to create HRAs. Minn.Stat. §§ 462.425–.426 (1976). But the provision that allowed counties to form HRAs specifically excluded the metropolitan counties of Hennepin, Ramsey, Scott, Carver, Anoka, Washington, and Dakota. Minn.Stat. § 462.426. The legislature had the option of giving ACHRA the same powers as a county HRA but did not. Instead, the special law states that ACHRA's powers and duties are the same as those of a city HRA. And we note that the housing and redevelopment act states that a county HRA and its commissioners shall "have the same functions, rights, powers, duties, privileges, immunities and limitations as are provided for" city HRAs and their commissioners "*except as clearly indicated otherwise from the context.*" Minn.Stat. § 462.429 (1976) (emphasis added). We discuss these exceptions next and note that the special law includes no such qualification.

When the legislature amended the housing and redevelopment act in 1971 to allow for the creation of county HRAs, it provided county HRAs with several powers and limitations that city HRAs did not have. These powers and limitations remain largely unchanged in the current statutes.

The differences between county and city HRAs and the statutes governing their relationships indicate that the limit on ACHRA's "jurisdiction" is broad and effectuates the statutory structure, which avoids duplication and provides for local control.

First, a county HRA was required to "serve, program, develop and manage all housing programs under its jurisdiction." Minn.Stat. § 462.426, subd. 3 (1971) (current version at Minn.Stat. § 469.004, subd. 5). This provision also stated: "In order not to foster the development and proliferation of minor political subdivision housing and redevelopment authorities, a county ... [HRA] shall preclude the formation of additional municipal housing and redevelopment authorities within the area of operation of said county [HRA] ... without the explicit concurrence of the county [HRA] ... and the state housing commission." *Id.* Second, a county HRA's area of operation included the entire county but

> a county [HRA] shall not undertake any project ... within the boundaries of any municipality ∶.. which has not empowered such [an HRA] to function therein ... unless a resolution shall have been adopted by the governing body of such municipality ... declaring that there is a need for the county ... [HRA] to exercise its powers in such municipality.

Minn.Stat. § 462.427, subd. 1 (1971) (current version at Minn.Stat. § 469.005, subd. 1). Finally, the legislature terminated all inactive city HRAs, stated that active city HRAs would continue to function, and excluded active city HRAs from the area of operation of their respective counties' HRAs. Minn.Stat. §§ 462.427, subd. 4, .4291 (1971) (current versions at Minn. Stat. §§ 469.005, subd. 4, .008).

Although the relative authorities of county and city HRAs are clearly delineated, HRAs of different political subdivisions are not precluded from collaborating. The legislature provided for cooperation and joint efforts by multiple HRAs when it amended the housing and redevelopment act to allow for the creation of county HRAs. Minn.Stat. § 462.445, subd. 5 (1971). In 1990 this section was amended to add the following provision: "A city, county or multicounty [HRA] may by resolution authorize another [HRA] to exercise its powers within the authorizing [HRA's] area of operation at the same time that the authorizing [HRA] is exercising the same powers." 1990 Minn. Laws ch. 532, § 7, at 1401 (codified at Minn.Stat. § 469.012, subd. 3(c)).

Because ACHRA has the powers of a city HRA, East Bethel did not need to obtain its approval before creating its own HRA. *Compare* Minn.Stat. § 469.003, *with* Minn.Stat. § 469.004, subd. 5. And ACHRA does not need the explicit approval of a city to operate within city boundaries as a county HRA would. *See* Minn. Stat. § 469.005, subd. 1. Instead, ACHRA and the East Bethel HRA are coequal. ACHRA can continue to cooperate with other city HRAs, operate within the limits of cities that do not have their own HRAs without explicit authorization, and operate within the limits of cities with their own HRAs with their authorization. But unless the East Bethel HRA expressly authorizes ACHRA's operation within the city's boundaries, ACHRA, as a city HRA, cannot exercise jurisdiction in East Bethel—a city with its own HRA.

█ We conclude that the statutes governing the relationship between county and city HRAs, read in conjunction with the special law that created ACHRA as a city HRA, confirm that subdivision 2 operates to preempt ACHRA's jurisdiction, including its taxing authority, in East Bethel after the creation of the East Bethel HRA. And we note that the Office of the Attor-

ney General reached the same conclusion in a letter, which was included in the record, responding to an inquiry from East Bethel. Additionally, the legislature specifically declared that the section enabling the creation of ACHRA does not "limit or restrict any existing [HRA] or prevent a municipality from creating an [HRA]." Minn.Stat. § 383E.17, subd. 2. ACHRA's continued ability to tax in every city that has created its own HRA would undermine this legislative objective.

Finally, because we conclude that the meaning of "jurisdiction" in subdivision 2 is unambiguous, we apply its plain meaning without resort to extrinsic evidence of intent. *See* Minn.Stat. § 645.16 (listing additional sources for ascertaining legislative intent when the statute is ambiguous). Nevertheless, our conclusion is bolstered by evidence in the record as to the legislative history of the special law. The minutes from a committee hearing on the proposed special law indicate that Anoka County's executive secretary believed it would "not affect any existing or future municipal housing and redevelopment authority." Hearing on S.F. No. 682 Before the S. Comm. on Local Gov't (Mar. 30, 1977) (statement of Ralph McGinley). At trial, the author of the house bill testified that the special law was intended to avoid duplicating the work of city HRAs; rather, its purpose was "[i]f some city did not enact an HRA or community development [authority] of some sort, the county would do it." Also, the language in the special law was consistent with the special laws allowing for the creation of HRAs in other metropolitan counties, which state that "[t]his section does not limit or restrict any existing housing and redevelopment authority or prevent a municipality from creating an authority." 383B.77 (Hennepin), 383D.41 (Dakota), Minn.Stat. § 383E.17 (Anoka) (2010); 1974 Minn. Laws ch. 473, § 2, at 1190 (Scott). This evidence indicates that ACHRA was created as a backstop for cities that did not have their own HRAs and that cities could create HRAs to provide services on their own, which would limit the need for ACHRA to operate in those cities.

## ACHRA's Taxing Authority in Cities Creating HRAs after ACHRA was Established

Because we conclude that the limitation on ACHRA's jurisdiction in subdivision 2 limits its taxing authority, we address ACHRA's alternative argument. ACHRA contends that it is prohibited from imposing special levies only in cities that already had HRAs when ACHRA was created, and not in cities that establish HRAs after ACHRA was created. ACHRA contends that the word "is" in the sentence restricting ACHRA's jurisdiction "in any municipality where a municipal housing and redevelopment authority *is* established" refers only to city HRAs already in existence. Minn.Stat. § 383E.17, subd. 2 (emphasis added). But as the district court correctly concluded, this interpretation runs counter to the legislature's statutory-interpretation on guidance that "words used in the past or present tense include the future." Minn.Stat. § 645.08(2). Moreover, we can discern no rational basis as to why the legislature would determine that cities with HRAs created before the special law was enacted should not be taxed, but cities with HRAs created after enactment of the special law should be taxed. Thus, we conclude that subdivision 2 prohibits ACHRA from levying special-benefit taxes in East Bethel despite the fact that the East Bethel HRA was not in existence when ACHRA was created.

Finally, ACHRA raises public-policy concerns related to its need to exercise county-wide taxing authority to pay for past and ongoing projects. But it is the

role of this court to determine whether a statute's meaning is plain and if so, to apply this meaning without regard to arguments regarding the appropriate public policy. *See* Minn.Stat. § 645.16 (stating that "the letter of the law shall not be disregarded under the pretext of pursuing the spirit"). Accordingly, we affirm the district court's judgment.

## DECISION

ACHRA's posttrial motions preserved its appeal of whether the special law authorizing the creation of ACHRA limits ACHRA's authority to assess special-benefit taxes on real estate in East Bethel. We conclude that the special law enabling the creation of ACHRA excludes from ACHRA's jurisdiction cities that establish their own HRAs, and that this limitation on ACHRA's jurisdiction affects its authority to assess special-benefit taxes. Consequently, absent an agreement with the East Bethel HRA, ACHRA cannot assess special-benefit taxes on the real property in East Bethel after East Bethel established its HRA.

**Affirmed.**